In Re IndyMac Mortgage, which is Valerio versus Olinsky. Good morning, Your Honor. Samuel Zakaroff on behalf of the appellants. This is a one-issue appeal concerning the role of the lead plaintiff in setting attorney's fees under the Private Securities Litigation Reform Act. The question that we appealed on was whether or not, pursuant to the statute, this Court should follow the Third Circuit in the Sendant cases and assign to the lead plaintiff a presumption of reasonableness in setting the attorney's fees, or whether, as we believe the District Court held, this was a matter for the District Court to exercise its customary judgment over in the matter of setting fees. We begin, as we must, by looking to the statute and the statutory scheme. The PSLRA in Section A3, Roman 5, says the following, the most adequate plaintiff shall, not may, but shall, subject to the approval of the Court, select and retain counsel to represent the class. The statute gives lead plaintiff the power and the obligation to retain counsel. The word retain is a common word in English, according to Webster's, it means to employ, to contract for services. Our submission here is that everything in the legislative history of the PSLRA, going back to the Beckerman and Weiss article upon which it was based, gives to the lead plaintiff the power to set the presumptive terms of retention, and that there is an affirmative burden on a District Court to disregard the recommendation of the lead plaintiff. In the interim— What do you think Judge Kaplan's role here was? I think Judge Kaplan's— Properly understood. Well, I think that that's set out in the Flanagan opinion of this Court, which obviously changes the landscape dramatically since we first filed the appeal. In Flanagan, this Court explained what a rebuttable presumption is, and it said that if there is evidence, and the word evidence is key because the PSLRA, in defining what rebuttable means in a different section, talks about the need to produce affirmative evidence. So what Judge Kaplan would have to do is to see whether there was evidence of pay to play, whether there's evidence of a failure of the lead plaintiff to discharge its fiduciary obligations, whether there was some other evidence of untoward conduct. Absent that, I believe that the statute, in the words that Flanagan uses, quoting from the Sandan 2 case, the statute moves the primary responsibility from the Court to the lead plaintiff for the setting of fees. In Flanagan, we drew on, but we didn't fully embrace, sendent. We applied the rebuttable presumption in a context quite different from here, where a non-lead plaintiff counsel for work completed after the lead plaintiff's appointment and lead plaintiffs advocated for non-lead counsel to receive a portion, we specifically said that we weren't dealing with the circumstance presented here. So I'm not sure how Flanagan really helps you. Well, Your Honor, Flanagan helps us because it adopts from the PSLRA and from the sendent case the presumption that it's the responsibility of the lead plaintiff to handle the fee question. But we said we weren't deciding if the fees that are paid would diminish class members' recovery, which is the concern here. And in Nortel, we cited the PSLRA's legislative history to say that we found nothing indicating a congressional intent for courts to consider the fees agreed upon by lead plaintiffs as presumptively reasonable. Aren't we bound by that? No, Your Honor. First of all, with regard to Flanagan, there was a $6 million reduction in the fees paid to counsel as a result of the ruling of the district court. So there was a tradeoff between how much—so there was an increase in the total attorney's fees as a result of the holding of this court. That doesn't deal with my concern, which is you're suggesting that Flanagan adopted sendent, and I'm saying it applied it in a circumstance quite different from here. It refused to reach the conclusion you're urging. I agree with that, Your Honor. I agree with that—absolutely. But Nortel suggests that the legislative history supports—does not support the conclusion. So I'm not— Nortel said it wasn't well presented in that case. And Nortel said— It said more than that. It's—I mean, we're going to get to whether yours is adequately presented here, but Nortel went into the legislative history. It didn't say the legislative history didn't say it wasn't well presented. They said there was nothing in it indicating an intent. Yes. And I think that that was revisited in Flanagan because Nortel said—and by the way, it was dicta in the most classic sense. But Nortel also said, even applying Nortel in this case, Nortel said that the recommendation of the lead plaintiff had to be given serious consideration because it was the best indication of what the market rates were. And that portion of the Nortel opinion immediately cites to Goldberger— Every serious consideration is very different from a rebuttable presumption. Oh, yes, I do, Your Honor. I do. I don't—I don't—I'm not here arguing that this Court is absolutely bound. What I'm saying is that if the presumption is applied to the pay given to the non-lead counsel with whom lead plaintiff has no contractual relationship prior to the fee award period, that it would be quite bizarre to say that that same presumption doesn't apply to the part of the oversight of counsel that the lead plaintiff took most active—took a most active role in. At the end of the day, what do you believe that Judge Kaplan's authority in a matter like this was? I believe his authority was to review to see if there was any impropriety in the evidence— hypothetically, that an agreement under which class counsel took 50 percent was too high and he cut it down to 25 percent. Would that have been acceptable? I think that— Would that have been within his authority? Certainly would be within his authority, Your Honor. I don't dispute that. I do not dispute that there is a role for the judge in this. And we do not read the statute to carve the judge out. What relief do you want? What relief? To go back to Judge Kaplan and say, think about this, think about it again, and apply some presumption? Your Honor, we moved for summary vacation something equivalent to the Supreme Court grant vacate remand. We thought that Flanagan sufficiently changed the terms of the law of this circuit that it should be given to Judge Kaplan in the first instance. However, I understood before that this was a disfavored procedure in this circuit, and now I've been reminded that it's a disfavored procedure in this circuit, and maybe I will never do it again. But nonetheless, nonetheless, Your Honor, at this point we're here. This is a case in which this is a unique kind of—this is not the standard securities case. These are mortgage-backed securities. The only people who bought these were sophisticated institutional players. They reviewed this. The Wyoming attorney general—the Wyoming is not a customary plaintiff in this. The Wyoming does not have an elected attorney general. They reviewed it. Every single big player who bought into these funds reviewed it, in many cases represented by private counsel. All of them signed off on it. I think the record is complete and that this Court should just follow the recommendation of the lead plaintiff. That's what I think should be done at this point. What should the decretal paragraph in any writing that we produce say? What should we be telling Judge Kaplan? I think that it should follow what the subsequent passage, the second part of Flanagan said, which is that there has to be—in order to reject the recommendation of the lead plaintiff, there has to be evidence of some impropriety, something—a fee that is outlandish— It's about presumption. It's a— And it requires some articulable basis to rebut the presumption. Is that what you're looking for? That's exactly what I'm looking for, Judge Radji. But Judge Kaplan's 20 pages didn't accomplish that. No, because Judge Kaplan relied on an FLSA case. Judge Kaplan relied on the auction house cases that he handled, which Sendam specifically found was unacceptable under the PSLRA because it undercut the role of the lead plaintiff. Judge Kaplan relied on his private experience and practice before the PSLRA. And the record is quite clear at pages 104 through 113 that when there was an effort made to put on the evidence of the Wyoming two funds, the treasurer and the retirement fund, Judge Kaplan says, I'm not prepared to hear the fees at this point, and then ruled on his own account and disregarded the evidence in the record of the role of the Wyoming funds in setting the fees ex-ante. Now, here we go back to Judge Lynch's opinion in Global Crossing on the importance of the ex-ante setting, that there was negotiation, that that's the evidence, as this Court said in Nortel, that there really is a market rate. Let me time this up. I have to take you to a preliminary question. We've let you argue the merits here, but there's an argument that this question was not presented to the district court. Yes. And if I understand the papers, just to get this through quickly, you're saying it was because your client cited cases that in turn cited send-it. Well, that didn't persuade us in Nortel, so why should it persuade us here? Because in Nortel that's all there was. I had the misfortune of arguing Nortel, so I'm quite familiar with the record there. There was just one footnote that cited one case and didn't give any explanation. In this case, Your Honor, first of all, obviously waivers of prudential doctrine, and there's lots of law from this circuit on that. But in Nortel, what this Court said was the way to do this is to present the evidence of what the agreement was with the lead plaintiff, which there wasn't any ex-ante agreement with the lead plaintiff in Nortel. Here we presented that evidence. Mr. Egan's declaration sets out the negotiations, the statements. I would think the way you make sure the judge understands your argument is you say, presumption, judge, I'm entitled to a presumption here. And that was never argued to Judge Kaplan that I see. Instead, the strongest argument I found was the suggestion that it was entitled to great deference. Well, you conceded a moment ago that that's, you know, giving substantial weight, giving great deference, is not the same as a presumption. Yes. And so I don't see where the presumption argument is preserved. Your Honor. You acknowledge that's the decretal language you want. That's the decretal language because Flanagan wrote— Now tell me why that's preserved and why Judge Kaplan wrote these 20 pages, never aware that what you thought he was obliged to do was give you a presumption. Your Honor, we introduced exactly what Nortel told us to introduce. We tried—we put it into the Goldberger factors because that's what Nortel said to do. We raised the question that you have to take account of what the lead plaintiff does. I understand we did not use— You argued for great deference, and you've acknowledged that's not a presumption. I mean, you're not here arguing to us that Judge Kaplan failed to give great deference. No, I am arguing that Judge Kaplan used the wrong legal standard and— He failed to give a presumption. Don't cite that to him. So I would think we've got a forfeiture here. Well, Your Honor, I would argue that we don't because the language we quoted from Global Crossing, and I wish it weren't in a footnote, but it is in a footnote, but the language we quoted from Global Crossing invokes Judge Lynch's careful invocation of Sandan and of the reasonable presumption. It's true we didn't make that argument in those terms, but it's an equitable doctrine, and we were trying to hew as close as possible to the Nortel position while pushing for more role for the lead plaintiff. And Judge Kaplan cut us off as an evidentiary matter. That's his do. But I think that the difference between using the word rebuttable presumption and the word substantial deference, I understand it's not the same legal standard, but it invites the inquiry into what the role of the lead plaintiff had been, and I think it would be inequitable to cut us off on that when the entire case that we tried to put forward was, look, we negotiated these contracts ahead of time just like they did in Global Crossing. They negotiated the Wyoming funds, negotiated a tougher deal than anybody else had ever done. But remember, Nortel says the legislative history doesn't support the presumption. So now you're saying you're trying to satisfy Nortel, which hasn't recognized the presumption, without saying presumption. I'm not sure that I think that a district court on this record would understand that you were asking for that legal standard. There was never any argument in colloquy with the judge either in which anybody used the word presumption. There was no colloquy permitted on the fees. We have nothing in this record. Well, what we have is the invocation of the PSLRA and the statutory language. Leave aside the legislative history. The statutory language says that the lead plaintiff shall retain. I understand that's your argument to us. I'm saying you never said to Judge Kaplan, you see this legislative history, Judge, this language either, that establishes a presumption. Your Honor, I can't refute that. We didn't use the language. I wish we had. I think we were close enough, given the instructions this court gave us in Nortel, to get to at least raise the question of the proper role of the lead plaintiff. We've kept you well past your time, and we've let you argue both the procedural and the substantive. Thank you, Your Honor. Counsel. May it please the court. I'm William Rubenstein. This court has appointed me as counsel to advocate for affirmance of the district court's opinion in this matter, and I'm honored to appear before you in that capacity this morning. Judge Parker, to come back to your point about the district court's opinion, I just remind the court, Judge Kaplan, acting as a fiduciary for thousands of absent class members in this case, carefully reviewed the fee request, analyzed it according to the percentage that was requested, undertook a lodestar crosscheck, worked through each of the six Goldberger factors, quite specifically one by one, rendered a 22-page legal decision that included two tables and a graph, and that ended up granting petitioners millions of dollars more than their lodestar in this matter. Counsel do not actually appeal or refute any of that or suggest it was an abuse of discretion. They raise, as they point out, only one issue on this appeal. They say that Judge Kaplan got it wrong in applying the law of the Second Circuit when he should have applied the law of the Third Circuit. As the court has already pointed out, this is an appeal by ambush. They never asked Judge Kaplan to apply the law of the Third Circuit. Their brief below never once mentions the Senden case. The table of contents of that brief is at 747 to 750 in the record. You'll see that never once do they cite the Senden case. The brief never once uses the word presumption. The brief never once asks for deference to the lead plaintiffs. What the brief does say is that they should give great weight to the decisions of the lead plaintiff in the case. I would point to the court's Nortel decision. In Nortel, the court said that the argument wasn't preserved because below what the plaintiffs had asked for was solely great weight. It's precisely the same language that was asked for here that was used in Nortel. And for the very same reason it was waived in Nortel, it's waived here as well. If ever there was a situation that didn't require a forgiveness of the waiver doctrine, this would be that situation. You have appellants who are very sophisticated lawyers. They have millions of dollars of their own money at stake. They're playing for a rule of law that was precisely the same rule of law that was played for in the Nortel case. They must have read Nortel. They must have known they should argue something more than the presumption is entitled to a great weight, and they never bothered to do it in this case. So I think the record is clear that the argument has been waived, and it's not appropriately before you. As I also point out in my briefs, this is not a good record upon which to take up the argument. Counsel has argued extensively about the ex ante contracts. We don't know what those contracts say. They're not in the record in this case. We have testimony about them, but all we know from that testimony is that they set caps on the fee award. So even if you were to assume some kind of presumption of reasonableness of those contracts, all it would tell you was that these were reasonable caps, and the lower court's decision falls within those caps. So this record doesn't even move the ball at all in thinking about this particular issue. It's not a good record upon which to take up the issue. Moreover, if you were to reach the issue, Your Honors, as you've already pointed out, Nortel has held that there's nothing in the legislative history of the PSLRA that supports the approach they're asking for. The PSLRA... My adversary suggested that the language of the PSLRA gives the lead plaintiff the right to retain lead counsel, and I have no argument with that. What the Nortel Court already held is that there's nothing in the language or the history of the PSLRA that suggests that Congress wanted all fee decisions to be given over to the lead plaintiff in those circumstances. And that's a holding of the court that is not dicta, as I've argued in my brief, and I think that's quite accurate in any case that the PSLRA does not do that. There's nothing in the situation that would suggest giving a presumption to the lead plaintiff either. A presumption, Your Honor, is something that you would use in adversarial litigation, where you have burdens of proof and you're asking who should the burden be on and who should you give the presumption to. Fee petitions like this are very important exercises because you have, in this case, you have $346 million of other people's money sitting in a federal court, and the question was how much of that money are you going to take out from those other people who are not present in the court. They're given notice, but they're very unlikely to show up to talk about it. They have little incentive to do so. They don't have the sophistication to do so. They're not given enough time to do so. The court acts as their fiduciary in that circumstance and plays a very important role in making sure those other people's money are not taken too greatly. It would be odd to create a presumption in this circumstance because the presumption would then shift the burden to the adversary of the fee applicant, but there is no adversary present in the proceeding. The class members are not present. They generally do not show up. They don't have the sophistication or the time. So when the burden gets shifted to them, there's no one there to do anything with it. It's a very peculiar approach to this situation. But one could imagine Congress doing it in the same sense that lead counsel is entrusted with all the other responsibilities of the litigation and assumes the responsibility for the whole class, and this way the court does not have to, you know, be doing major accounting. It would look for the signs of anything untoward that would rebut the presumption. I mean, it's not outside the realm of Congress's choices. You're just saying they didn't make it here, right? Correct, Your Honor. If we were in a situation where Congress had explicitly said we delegate that authority or we want the courts to presume, we'd be in a very different situation. Congress never said that. I would go a step further. When Congress was enacting the PSLRA, they were relying to some great extent on a law review article written by Weiss and Beckerman which laid out that in that law review article, it did suggest giving fee decisions to the lead plaintiffs, and Congress explicitly did not adopt that part of the article. I think Congress quite explicitly did not want to remove the independent federal judiciary from oversight of how much of these absent class members' money is going to be extracted from them. The federal judiciary has been the fiduciary of absent class members. You are independent. Judge Kaplan's review is typical. It is searching. It is skeptical. It is careful. These are the people we trust to oversee other people's money who aren't present. Lead plaintiffs play a valuable role in this, but they are repeat players. They have institutional relationships with the lead counsel. They're in many, many different situations with them over time. The law review articles are quite clear. The empirical evidence shows that when you have lead plaintiffs who are public pension funds that receive campaign contributions for their officials from the lawyers who run these cases, that the fees tend not to go down as much as they do otherwise under the PSLRA. There's no record to suggest that anything like that happened here, is there? Well, Your Honor, there's nothing in this record to suggest there's a specific play-to-play situation here. However, the record does suggest the following thing. The lead plaintiffs here, the Wyoming funds, have been represented by these counsel in other cases, number one. And that's clearly in the record at page 206 in the record in paragraph 10b. It's also clear that lead counsel initiated the case by coming to the Wyoming funds and bringing the idea of the case to them. That's also in the same place in the record here. So you have a situation with parties with ongoing relationships with one another from the affidavits they've put in the records about this case. Secondly, you have not only the single lead plaintiff, the appellant here, you have five other law firms representing five other pension funds that are also appellants here. All of these law firms, and lead plaintiffs are an example, often provide portfolio monitoring services for these pension funds. And all of these lead plaintiffs regularly give campaign contributions to officials who run these types of funds. They point out in this case that the Wyoming attorney general is not an elected official, but the Wyoming attorney general is not the plaintiff in this case. It's the Wyoming treasurer who is the plaintiff who is an elected official. So it has some of the ramifications of a typical case, Judge Parker, but you're also making law here for the vast run of cases, and the public pension funds are the lead plaintiffs in about 35 to 40 percent of these cases. And the institutional arrangements that occur in these situations are such that should give you pause about giving so much authority of a presumption to institutions in this relationship. And isn't your argument really that, given all of the factors you've just laid out, is a reason for us to assume that Congress would not want to have done what your adversaries are suggesting, that is give carte blanche to lead plaintiffs to set fees? I think that's exactly right. I think if Congress had this evidence in front of it, as the PSLRA has developed, they would be very hesitant to take away the authority of the independent federal judiciary to oversee fees and give it to people in these types of institutional arrangements with one another. Even at the time they enacted the PSLRA, not knowing what was going to happen, they did not take away from the independent federal judiciary the fiduciary duty of safeguarding the absent class members' money that's put in at a common fund case in front of the federal judiciary in that circumstance. Thank you very much, Your Honor. Thank you. Mr. Sakharoff, we kept you past your time, but you still have a few minutes. Thank you, Your Honor. First of all, Nortel says we leave open the question of how much weight should be given to the fees agreed upon by the PSLRA lead plaintiffs. So I think that Nortel does not close this issue. Secondly, the question that Mr. Rubenstein doesn't like, clearly doesn't like the statutory arrangement that Congress created. Congress didn't carve out the role of the federal judiciary. Congress changed it into a supervisory role, not a direct managerial role. This court in Flanagan quoted from Sendam II on the primary responsibility shifting from the court to the lead plaintiff. The next sentence of Sendam II says the following, the PSLRA lead plaintiff is the decision maker for the class, deciding which lawyers shall represent the class and how they will be paid. So your sister circuit has examined exactly what the PSLRA statutory language and legislative history provides and says this has indeed shifted. And the evidence that we put into our brief is that it has worked. Fees have come down dramatically. If you compare the fee arrangement in this case with Global Crossing, which is about the same size ultimate settlement, you will see that even in the ten years between these two cases, the fees are lower here under the arrangement that was entered into with the Wyoming funds. Now, the question Mr. Rubenstein raises is that there are other cases out there involving small investors, small players who may have no incentive to come forward. That is not this case. These were big boys and girls who were involved in this market. They had counsel. There were multiple actors who appeared before in the overall IndyMac litigation. There were multiple pieces of it. This court heard several appeals and heard appeals on parallel cases involving other mortgage-backed securities. So it is not the type of case where we need to have this consideration. And we didn't put the . . . Okay, so let me deal with the two procedural waiver questions. One is appeal by ambush. We put forward in the district court . . . I'll grant Judge Raggi that we did not use the language exactly as we would have it here. I'll grant that. But there is no question that we put before Judge Kaplan what the lead plaintiff had done. On page A-207, in the original retention, Judge Kaplan was on notice, and it was right in the affidavit of the lead plaintiffs, that they had entered into a contractual relationship. The contracts were not in because we had attorney-client issues, and the fees were handled at the same time as the settlement approval. If there had not been settlement approval, we did not want to put our fees, our contractual arrangements, in the public domain. We had turned it over in highly adversarial proceedings in camera, not in camera, under seal, to the other side, to the defendants, when they challenged class certification. But Mr. Egan's declaration, which is available at pages 804 through 807 of the appendix, sets out every term of the contract, and our tables to the district court set that out as well. Our tables in this case, Mr. Rubenstein reproduces the same table as to our fee arrangements. There's no dispute about that. And it's not just that it's the cap. It shall go no higher, and it shall be no more than three times Lodestar. This was a carefully negotiated arrangement. If we go back, we will put these into evidence, because now the case is over. There's no issue about it. But at the time, we were hamstrung by that. And then the question that if they are sufficiently accounted for, what is the role of the lead plaintiff then? The one thing that Mr. Rubenstein cannot explain is what is the lead plaintiff doing? What's the point of this contract? Is it simply to provide some evidence for the district court? Well, the district court gave it no evidentiary weight whatsoever. He gave you Lodestar Plus. He gave us Lodestar Plus, but the Lodestar had been also a matter of negotiation ex ante. And the Lodestar Plus, Your Honor, was 1.16, which amounts to basically no Lodestar, no risk in a situation in which we're not trying to capture money from current shareholders to give to past shareholders with the same people, the critique that's made usually. This is all new money against underwriters. This is a tough case which brought in $346 million of new money. The Wyoming funds are here not because they're patsies of the plaintiff's bar. Wyoming, plaintiff's bar, you've got to be kidding. This is the most conservative state in the country, and they lost $40 million, a small state. They had a huge stake in this. Thank you, Your Honor. Thank you for your advisement.